1  KRISTA L. BAUGHMAN (SBN: 264600)
   kbaughman@dhillonlaw.com
2  KARIN M. SWEIGART (SBN: 247462)
   ksweigart@dhillonlaw.com
3  DHILLON LAW GROUP INC.
4  177 Post Street, Suite 700
5  San Francisco, California 94108
   Telephone: (415) 433-1700
6  Facsimile: (415) 520-6593
7
8  Attorneys for Plaintiffs Dual Diagnosis
   Treatment Center, Inc., a California
9  corporation; Adeona Healthcare, Inc., a
   California limited liability company and
10 Tonmoy Sharma, an individual
11
12              **UNITED STATES DISTRICT COURT**
13              **CENTRAL DISTRICT OF CALIFORNIA**
14                  **SOUTHERN DIVISION**

| | |
|---|---|
| 15 **DUAL DIAGNOSIS TREATMENT** | Case Number: |
| 16 **CENTER, INC.,** a California corporation; **ADEONA HEALTH** | |
| 17 **CARE, LLC,** a California limited | **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES** |
| 18 liability company; and **TONMOY SHARMA,** an individual, | |
| 19 | |
| 20            Plaintiffs, | **JURY TRIAL DEMANDED** |
| 21            v. | |
| 22 **CALIFORNIA DEPARTMENT OF** | |
| 23 **SOCIAL SERVICES,** a California public agency; and **GREGORY ROSE,** | |
| 24 sued in his official and individual | |
| 25 capacities, | |
| 26            Defendants. | |
| 27 | |
| 28 | |



Plaintiffs Dual Diagnosis Treatment Center, Inc. ("Dual Diagnosis"), Adeona Health Care, LLC ("Adeona"), and Tonmoy Sharma ("Sharma") (collectively, "Plaintiffs") bring this action against Defendants California Department of Social Services ("DSS") and Gregory Rose ("Rose") (collectively, "Defendants"), for declaratory, injunctive, and monetary relief following Defendants' adoption of a decision that violates Plaintiffs' constitutional rights under the Fourteenth Amendment to the United States Constitution, as set forth below.

## INTRODUCTION

1.  For nearly 20 years, Plaintiff Sharma has pursued a successful and highly esteemed occupation in executive management of residential health companies. For nearly a decade, Dual Diagnosis and Adeona have been duly licensed by the California Department of Social Services to operate adult residential facilities providing non-medical care to adults with developmental disabilities who require personal services, supervision, or assistance with daily living activities, and these facilities have received awards and accolades for the excellent care they provide.

2.  For many years, DSS and Plaintiffs enjoyed a collaborative and transparent working relationship. Yet this relationship soured in 2016, when DSS made certain arbitrary and politically-motivated decisions about which Plaintiffs complained. Eager to be rid of Plaintiffs, DSS invoked two unconstitutionally vague "conduct inimical" statutes to revoke Plaintiffs' licenses and terminate Sharma's ability to pursue his livelihood, on a mere pretext.

3.  Specifically, in 2016, DSS decided that an isolated event that had taken place in a foreign country nearly a decade earlier – an event of which DSS had been *fully aware* for years and had previously determined posed *no issue* to granting Plaintiffs' licenses – was suddenly "inimical" pursuant to Cal. Health and Safety Code sections 1550(c) and 1558(a)(2) (the "conduct inimical" statutes). These statutes give unbridled discretion to DSS to declare whether conduct is "inimical to the health, morals, welfare, or safety of either the people of this state or an individual in, or



Complaint                                                                                           Case No.

receiving services from, the facility or certified family home," without any definition of what "inimical" means, and with no notice to individuals of what conduct is, or is not, prohibited.

4.     Defendants' conduct has eviscerated Plaintiffs' livelihoods and reputations, and stripped them of their constitutionally-protected property rights and liberty interests, in violation of the Fourteenth Amendment to the United States Constitution. For the reasons set forth below, Plaintiffs are entitled to be made whole for the extreme financial hardship and reputational damage they suffered as a direct result of Defendants' arbitrary and unconstitutional actions. They also seek declaratory and injunctive relief sufficient to confirm that the unconstitutionally vague "conduct inimical" statutes do not continue to harm Plaintiffs or others.

**PARTIES**

5.     Plaintiff Dual Diagnosis Treatment Center, Inc. ("Dual Diagnosis") is a California corporation located in San Clemente, Orange County, and doing business as Sovereign Health of California. Dual Diagnosis is a minority-owned business, and its founder and CEO at all relevant times was Plaintiff Tonmoy Sharma.

6.     Plaintiff Adeona Health Care, LLC ("Adeona") is a California limited liability company located in San Clemente, Orange County. Adeona is a minority-owned business, and its founder and CEO at all relevant times was Plaintiff Tonmoy Sharma.

7.     Plaintiff Tonmoy Sharma ("Sharma") is an individual who resides in Orange County, California. Sharma was the founder and CEO of Dual Diagnosis and Adeona Health Care.

8.     Defendant California Department of Social Services (DSS) is a department of the California Health and Human Services Agency, a California public agency responsible for licensing adult residential care facilities.

9.     Defendant Gregory Rose, sued in his official and personal capacities, is an individual who was, at all times relevant to this complaint, Deputy Director of the Children and Family Services Division of DSS. Mr. Rose had decision-making authority

3



Complaint                                                                                          Case No.

1    with respect to the conduct alleged in this Complaint; specifically, he was responsible
2    for adopting the DSS Decision that forms the basis for this lawsuit.

3                            **JURISDICTION AND VENUE**

4          10.    This action arises under 42 U.S.C. § 1983 in relation to Defendants'
5    deprivation of Plaintiffs' due process rights under the Fourteenth Amendment to the
6    U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28
7    U.S.C. §§ 1331 and 1343.

8          11.    This Court has personal jurisdiction over Defendants because they are
9    domiciled in the State of California, have sufficient minimum contacts with California,
10   and/or otherwise have intentionally availed themselves of significant benefits provided
11   by the State of California, rendering the exercise of jurisdiction by this Court
12   permissible under traditional notions of fair play and substantial justice.

13         12.    Venue is proper in this judicial district under 28 U.S.C. § 1391 because a
14   substantial part of the acts or omissions giving rise to the claims for relief were directed
15   toward this District, and at least one Defendant is deemed to reside in this District.

16         13.    There is no requirement to exhaust administrative remedies before filing
17   suit under 42 U.S.C. § 1983. *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 102
18   S.Ct. 2557, 73 L.Ed.2d 172 (1982).

19                          **INTRADISTRICT ASSIGNMENT**

20         14.    This Action is properly assigned to the Southern Division of the Court,
21   because all Plaintiffs reside in Orange County, and a substantial part of the acts or
22   omissions giving rise to the claims for relief were directed toward Orange County.

23                               **RELEVANT FACTS**
24                                 **The Parties**

25         15.    Defendant California Department of Social Services ("Department" or
26   "DSS") is the state agency responsible for the licensing and inspection of adult
27   residential facilities and group homes.

28         16.    Defendant Rose is an individual who, at all times relevant to this

                                          4



Complaint                                                               Case No.

complaint, was Deputy Director Children and Family Services Division of DSS with decision-making authority for DSS with respect to the conduct alleged in this Complaint.

17. Plaintiff Sharma graduated from medical school in India, completed his medical residency in psychiatry in London in 1988, and worked as a lecturer and researcher in the field of psychiatry in London from 1997 to 2003. Subsequently, Sharma moved to the United States and began working with residential health companies. Sharma is the founder and was chief executive officer (CEO) of Plaintiffs Dual Diagnosis and Adeona.

18. Plaintiffs Dual Diagnosis and Adeona are collectively referred to as the "Entity Plaintiffs," herein.

19. All Plaintiffs have historically operated licensed facilities in five states, including numerous DSS-licensed facilities in California.  Plaintiffs have offered specialized treatment for mental health, substance abuse, dual diagnosis disorders, and non-medical care for developmentally disabled adults.

20. Plaintiffs' approach to addiction and other mental health treatment has at all times been consistent with best practices in the industry. Plaintiffs' facilities have been awarded Gold Seal accreditation by the Joint Commission, the highest level of accreditation available in the behavioral health field. The National Alliance on Mental Illness ("NAMI") has recognized Plaintiffs for providing "the gold standard in mental health treatment for patients in Orange County and throughout the country." A 2016 study conducted by Harvard Medical School affiliate McLean Hospital found that Plaintiffs' residential patients improved substantially more on measures of symptoms and functional deficits than patients at other behavioral health facilities.

21. While Plaintiffs no longer operate facilities as a result of the events discussed in this Complaint, during their operation, they were highly regarded as behavioral health educators. The Association of Psychology Postdoctoral and Internship Centers approved Plaintiffs' facilities as training facilities, a distinction shared with



Complaint                                                                                                   Case No.

academic centers such as Harvard Medical School and Johns Hopkins. The University of Southern California sent its Master of Social Work students to receive training at Plaintiffs' facilities. The California Board of Behavioral Health Sciences, the California Association for Alcohol/Drug Educators, and the National Association for Alcoholism and Drug Abuse Counselors had approved Plaintiff entities to provide continuing education to licensed professionals.

22.     Sharma is also a recognized leader in the behavioral health field. He has been a Board member of the Orange County Chapter of NAMI, a non-profit organization that provides education and resources to families with loved ones affected by mental illness. Sharma has been invited to speak at the Telehealth Capitol Connection, a briefing series for Congress, federal agencies, and other stakeholders designed to shape federal policy on improving healthcare access for children.

23.     Prior to the events at issue in this Complaint, Adeona was licensed by DSS to operate an adult residential facility by the name of Sovereign Health Rancho/San Diego ("RSD Facility"), located in El Cajon, California.

24.     Prior to the events at issue in this Complaint, Dual Diagnosis, doing business as Sovereign Health of California, was a co-licensee on a license issued by DSS to operate an adult residential facility by the name of Sovereign Health Cordoba ("Cordoba Facility"), located in San Clemente, California.

25.     Prior to the events at issue in this Complaint, Sharma had pursued an occupation and profession in executive management of DSS-licensed facilities, and he was permitted by DSS to maintain employment in, presence in, and contact with clients of any DSS-licensed facility, and to hold the position of member of the board of directors, executive director, and/or officer of the licensee of any DSS-licensed facility.

26.     Prior to the events at issue in this Complaint, Sharma served as CEO of Adeona and Dual Diagnosis, which were the licensees of the RSD Facility and the Cordoba Facility, respectively. In this role, Sharma provided no medical or clinical services to residents of the licensed facilities; rather, his role was exclusively related to

6



Complaint                                                                                    Case No.

1   the strategic development and business operations of the facilities.

2   **Plaintiffs' Facilities Enjoy Long-Standing Approval by DSS**

3   27.     Plaintiffs operated facilities licensed by DSS since 2009. For years,

4   Plaintiffs and DSS enjoyed a cooperative relationship. They routinely worked together

5   to identify any ways in which Plaintiffs could improve their services, and Plaintiffs

6   promptly addressed and, where appropriate, remedied any issues arising at Plaintiffs'

7   facilities.

8   28.     At all times, Plaintiffs were fully transparent and forthcoming with DSS

9   regarding any information that could bear upon Plaintiffs' suitability for licensure.

10   29.     As relevant to this action: in 2014, DSS was made aware that a non-

11   criminal administrative hearing had been held in the United Kingdom in 2008, regarding

12   Dr. Sharma's time as a lecturer and researcher in the field of psychiatry in London from

13   1997 to 2003. The hearing concluded in 2008, with a decision that Dr. Sharma's name

14   would no longer be reflected on the medical register in that country (the "UK

15   Decision").[1] The UK Decision concerned certain non-criminal conduct that, as noted in

16   the decision, had not been repeated since 2003.

17   30.     At all times relevant to this action, DSS was made fully aware of the

18   existence and content of the UK Decision.

19   31.     Specifically, in June 2014, Sharma and RSD Facility Administrator Jason

20   Hennick attended a meeting with DSS manager Sherri Cummings regarding Plaintiff

21   Adeona's adult residential facility license application for the RSD Facility. During that

22   meeting, Cummings had a copy of the UK Decision (which was also publicly available

23   on the Internet at that time), and she asked Sharma general questions about the findings

24   of the UK Decision, which Sharma answered transparently.

25   32.     During the meeting, Cummings indicated that she was asking about the UK

26   Decision because she had recently seen an article about it in the Orange County

27   _____

28   [1] Sharma remains a doctor in good standing in India, and his medical license is
recognized by the Medical Board of California.

7



Complaint                                                              Case No.

Register. Sharma informed Cummings that he was aware of this article and had, in fact, written a letter to the Orange County Register to correct certain inaccuracies in the article regarding the characterization of the UK Decision.

33. Immediately following their meeting, Sharma emailed Cummings a copy of the letter he had written to the Orange County Register, to ensure that DSS had a complete file regarding the UK Decision matter and Sharma's position thereon. In this email, dated June 19, 2014, Sharma stated "OC register – I was not sure what aspects [DSS] was worried about if any so I have included the letter to the OC register…and the corresponding letter that is referred to in the article."

34. Six days later, on June 25, 2014, and with full knowledge of the UK Decision, DSS issued to Adeona a license for the RSD Facility.

35. The following January, 2015, DSS issued an adult residential facility license to co-licensee Dual Diagnosis, for the Cordoba Facility.

36. Patently, prior to the events at issue in this lawsuit, the UK Decision was known to DSS and was *never* considered by DSS to be grounds for sanctions of any sort against Dr. Sharma or the Entity Plaintiffs.

37. Yet, thanks to a vague and unconstitutional California statute granting unbridled discretion to DSS, DSS was subsequently able to reverse its position and cite the very UK Decision it had previously evaluated as harmless as grounds to deprive Plaintiffs of their livelihoods and property rights, as discussed below.

### "Conduct Inimical"

38. The California Community Care Facilities Act, Health and Safety Code §§1500 *et seq.,* governs the licensing and operation of adult residential facilities and group homes.

39. Health and Safety Code §1550 provides in pertinent part:

> The department may deny an application for, or suspend or revoke, any license, or any special permit, certificate of approval, or administrator certificate, issued under this chapter upon any of the following grounds and

8

Complaint                                                                                     Case No.

in the manner provided in this chapter…

(a) Violation of this chapter or of the rules and regulations promulgated under this chapter by the licensee or holder of a special permit or certificate.

(b) Aiding, abetting, or permitting the violation of this chapter or of the rules and regulations promulgated under this chapter.

(c) **Conduct which is inimical to the health, morals, welfare, or safety of either the people of this state or an individual in, or receiving services from, the facility or certified family home**. (Emphasis added)

40.    Health and Safety Code §1558, subdivision (a), provides in pertinent part:

(a) The department may prohibit any person from being a member of the board of directors, an executive director, or an officer of a licensee, or a licensee from employing, or continuing the employment of, or allowing in a licensed facility or certified family home, or allowing contact with clients of a licensed facility or certified family home by, any employee, prospective employee, or person who is not a client who has:

(1) Violated, or aided or permitted the violation by any other person of, any provisions of this chapter or of any rules or regulations promulgated under this chapter.

(2) **Engaged in conduct that is inimical to the health, morals, welfare, or safety of either the people of this state or an individual in, or receiving services from, the facility or certified family home**. (Emphasis added).

41.    The Health and Safety Code provides no definition of "conduct inimical," nor any examples of what conduct would be considered by DSS to be "inimical."

42.    The Health and Safety Code does not explain or describe what type of conduct would be considered "inimical…to the people of this state," as opposed to "inimical… to an individual in, or receiving services from, the facility or certified family



Complaint                                                                                          Case No.

home," or what conduct might be "inimical" to both sets of people.

43.     The Merriam-Webster dictionary defines "inimical" as "being adverse often by reason of hostility or malevolence," "having the disposition of an enemy: hostile," and "reflecting or indicating hostility: unfriendly."

44.     Precedent establishes that DSS has liberally exercised its unbridled discretion under these "conduct inimical" statutes by declaring a wide variety of conduct to be "inimical." While this conduct is often found where a licensee has allowed sexual misconduct, child endangerment, or drug/alcohol abuse to take place in or around the facility, the DSS has not confined itself to those categories – indeed, the following types of conduct have been deemed "inimical" by DSS:

    a.  driving unsafely (*In re Harris,* 10 CDSS 04);
    b.  having a "rude, abrasive, and uncooperative attitude" in dealings with DSS (*In re Torres,* 10 CDSS 10);
    c.  allowing a child over 5 years of age to share a bedroom with another child of the opposite sex (*In re Green,* 99 CDSS 13);
    d.  remaining married to a felon even though he was removed from and had no presence in a facility (In re Gillespie, 10 CDSS 03).

45.     The unconstitutionally vague nature of sections 1550(c) and 1558(a)(2) is seen in DSS's expansive application of "conduct inimical" to the above examples, and particularly in its unprecedented application to Plaintiffs, as discussed herein.

### DSS Invokes "Conduct Inimical" To Illegally Terminate Plaintiffs' Livelihoods and Property Rights

46.     In 2016, Dual Diagnosis and Satya Health of California, Inc. ("Satya Health"), another business of which Sharma was the founder and CEO, hoped to obtain DSS licenses to run facilities that would provide 24-hour non-medical care to adults with developmental disabilities who require personal services, supervision, or assistance with daily living activities. As the first step in applying for facility-specific licensure,

Complaint            Case No.

1    Dual Diagnosis and Satya Health submitted a "master application" to DSS.

2         47.    In January 2016, DSS informed Plaintiffs that "your master application is
3    approved" and invited Plaintiffs to "please proceed with submission of other
4    applications to their respective regional offices."

5         48.    As instructed, in February 2016, Dual Diagnosis filed applications for
6    licenses to operate three adult residential facilities ("ARF"), in Los Angeles, Palm
7    Desert, and Culver City, California. Also in February 2016, Satya Health filed
8    applications for licenses to operate two ARFs, one in Laguna Niguel and one in La
9    Quinta, California.

10        49.    In light of DSS's approval of the preceding "master application," Dual
11   Diagnosis and Satya Health reasonably expected that their five applications would be
12   granted. This expectation was not unfounded: indeed, internal DSS emails confirm that
13   these applications were "ready for licensure in January [2016]."

14        50.    However, instead of receving confirmation of the license grant, in May
15   2016, DSS asked Sharma to attend a conference with DSS regarding "outstanding
16   issues." During this conference, which was held on June 13, 2016, DSS staff asked Dr.
17   Sharma about the UK Decision, and Dr. Sharma was fully cooperative and addressed
18   DSS's queries with full candor.

19        51.    Following this meeting, Claire Matsushita, the person authorized on behalf
20   of DSS to decide whether to grant or deny the five applications, decided that all five
21   applications should be denied, based on "concerns of inimical conduct" in connection
22   with the UK Decision.  "Inimical conduct" was the sole reason given by DSS for denial
23   of the applications.

24        52.    By letter dated September 7, 2016, DSS notified Sharma that the five
25   applications submitted by Dual Diagnosis and Satya Health had been denied. The letter
26   explained the denial as follows:

27
28              "The denial of your applications is based upon your failure to provide
                satisfactory evidence that you can meet or conform to licensing



Complaint                                                                    Case No.

requirements as outlined in the Health and Safety Code, commencing with 1500 et. [sic] **The specific regulation sections, which you have demonstrated the inability to comply is 1550(c) and 1558(a)(2) Conduct Inimical.**" (Emphasis added).

53.     The September 7, 2016 letter provided no detail regarding why the UK Decision (which DSS had known about for years) was suddenly deemed "inimical conduct." Nor was any explanation given for whether the conduct was deemed inimical to "the people of this state" or to "an individual in, or receiving services from, the facility or certified family home," or to both.

54.     No other grounds were cited for the licensure denial.

55.     DSS deemed the UK Decision to constitute "conduct inimical" in 2016, despite the following facts and law:

    a.  DSS had been aware of the UK Decision since 2014;

    b.  After learning about the UK Decision, DSS had extended licensure to Sharma's companies, Adeona and Dual Diagnosis, in 2014 and 2015, and also approved the "master application" for licensure for Dual Diagnosis and Satya Health in 2016;

    c.  DSS had never before expressed to Plaintiffs that the UK Decision was a ground for sanctions of any type, let alone "inimical" to the interests of California citizens or facility clients;

    d.  Plaintiffs had a demonstrated track record of operating successful and compliant facilities licensed by DSS, and Sharma had cleared the DSS "Livescan" background check numerous times;

    e.  The UK Decision: did not concern conduct that violated any civil or criminal laws or any DSS rules or regulations; did not concern conduct taken at any any DSS-licensed facility or rendered to any person receiving treatment at such facility; concerned conduct alleged to have occurred nearly 20 years earlier; was issued by a foreign country.

12

Complaint                                                                 Case No.



56.     The DSS's decision is even more perplexing given that, as DSS well knew, Sharma's involvement in DSS-licensed facilities had always been limited to *operations*; Sharma did not render any medical treatment or clinical services to facility clients. Sharma was amply qualified to perform an operations role.

57.     In fact, DSS does not even require any special qualifications or experience (let alone a medical license) in order to operate an adult residential facility in California; rather, all that is required is "commitment to care for residents and the knowledge of applicable laws and regulations," which Sharma has in spades. Indeed, even convicted felons may receive permission to operate ARFs.[2]

58.     Thus, it was entirely arbitrary for DSS to deem that an outdated foreign decision rendered Sharma, a highly qualified professional with a long track record of success in his field, unfit to perform an operations role for a DSS-licensed facility. This arbitrary decision was permitted by the unconstitutionally vague wording of sections 1550(c) and 1558(a)(2) of the Health and Safety Code.

59.     The DSS's September 7, 2016, letter was followed in short order by two additional letters to Sharma, each dated October 31, 2016, in which DSS notified Sharma that DSS had terminated its review of Plaintiffs' other license applications, as well.

### Plaintiffs Challenge DSS's Arbitrary Action
### And Face Retaliation

60.     In light of DSS's arbitrary conduct, Plaintiffs had no choice but to mount a legal challenge. Plaintiffs' corporate counsel wrote to DSS several times to explain how its position regarding "conduct inimical" was contrary to law and logic, and to ask that DSS reconsider its decisions.

61.     On November 10, 2016, Satya Health and Dual Diagnosis appealed the denial of their license applications.

62.     On November 23, 2016, Plaintiffs and Satya Health filed a lawsuit against

---

[2] *See* Letterhead template (ca.gov).



Complaint                                                                    Case No.

1    DSS and its agents in Los Angeles Superior Court, challenging the DSS decision

2    pursuant to federal and state law and alleging illegal and improper conduct in denying

3    the license applications, including unconstitutional discrimination.

4        63.    Apparently, DSS was displeased with Plaintiffs' complaints, and decided to

5    take action to remove Sharma and his companies from the industry, for good.

6        64.    On December 21, 2016 – less than one month after Plaintiffs filed their

7    lawsuit against DSS – DSS filed an Accusation and Statement of Issues against Satya

8    Health, Dual Diagnosis, and Dr. Sharma (the "Accusation"), seeking not only to affirm

9    the denial of the license applications, but also to exclude Dr. Sharma from any facilities

10   licensed by the Department, *for life*.[3]

11       65.    The DSS Accusation was subsequently amended four times. In the first

12   amendment, on February 10, 2017, DSS added Adeona as a respondent and sought, for

13   the first time, revocation of Adeona's *existing licenses* to operate the RSD Facility.

14   Subsequently, DSS sought revocation of Dual Diagnosis's *existing license* for the

15   Cordoba Facility.

16       66.    In the final iterations of its Accusation, DSS added complaints of alleged

17   "code violations" and "financial difficulties" that were purportedly affecting the

18   operations of the RSD Facility and/or the Cordoba Facility – despiste the fact that many

19   of these problems had been promptly corrected by Plaintiffs and cleared by DSS.

20       67.    The "code violation" and "financial difficulties" allegations were added to

21   the Accusation much later, approximately *one year* after the DSS had first decided that

22   the UK Decision was "conduct inimical."

23       68.    The "code violation" and "financial difficulties" allegations were mere

24   pretexts that were added not for their legitimacy, but rather to "paper the file" in support

25

26   _____

    [3] Based on a review of reported decisions, Plaintiffs are informed and believe that DSS

27   has never before excluded an individual for life from working in or being present in a

    licensed facility under remotely comparable circumstances.

28



Complaint                                                                      Case No.

of the conduct DSS wanted to take against Plaintiffs and, on information and belief, to obscure the merits of any constitutional challenge Plaintiffs might mount on the grounds that sections 1550(c) and 1558(a)(2) are void for vagueness.

69.    As Plaintiffs learned much later, the UK Decision – and more specifically, the "bad press" it received in January 2016 –  was the sole legitimate reason motivating DSS's decision to terminate Plaintiffs' licenses and livelihood.

70.    The fact that the UK Decision was the sole legitimate reason for DSS's prosecution of Plaintiffs can be seen from the chronology of events memorialized in DSS's own internal emails, which have been produced to Plaintiffs in prior legal proceedings. These emails confirm, *inter alia,* the following facts:

    a.  On Friday, January 22, 2016, DSS Chief Deputy Director, Pete Cervinka, received an email containing a news article about the UK Decision. In a snap decision he made that same day, and without any investigation whatsoever, Cervinka emailed his colleagues: "See below [press article re: UK Decision]. Any affiliations that he [Sharma] has should be ended."

    b.  In an email dated April 12, 2016, DSS agent Claire Matsushita stated that she was "hoping, **given the bad press**, the board could encourage him [Sharma] to step down." (Emphasis added). This email continues as follows: "However, this hasn't happened. Therefore, I need you to **dig a little deeper** and find out which agency/department we need to contact and obtain records of his disciplinary actions." (Emphasis added).

    c.  In an email dated July 28, 2016, DSS agents concede that the UK Decision is the "main issue" with Plaintiffs' licensure.

    d.  In an email dated November 15, 2016, DSS agents discussed background information regarding the decision to penalize Sharma, stating "the initial direction to take action against Dr. Sharma was provided by Chief Deputy Director, Pete Cervinka and the final decision after investigation and legal consultation was made at the Program Office ~~the assistant program~~

15



1  ~~administrator level~~ [**What evidence do we have of this?].**" (Emphasis and

2  strikethrough in original).

3      71.    The emails discussed above confirm, beyond question, that the decision to

4  revoke Plaintiffs' licensure and privileges was based on an un-vetted and unilateral

5  decision made quickly by DSS Chief Deputy Director Cervinka on a Friday evening in

6  2016, after reading the "bad press" about Sharma.

7      72.    The emails discussed above confirm, beyond question, that the only reason

8  DSS revoked Plaintiffs' licensure and privileges was in light of "bad press" about

9  Sharma that created a political optics problem for DSS – not because the UK Decision,

10  or any care Plaintiffs had provided to their clients for years on end, posed *any legitimate*

11  *threat* to California's citizenry.

12      73.    DSS relied on California's "conduct inimical" laws to enable DSS to

13  punish Sharma and Plaintiffs for the "bad press" about the UK Decision. Indeed, DSS

14  only added allegations of "code violations" and "financial difficulties" to its Accusation

15  as an afterthought months later. On information and belief, these allegations were added

16  not for their legitimacy, but rather to obscure the merits of any constitutional challenge

17  Plaintiffs might mount on the grounds that §§ 1550(c) and 1558(a)(2) are void for

18  vagueness.

19              **The Administrative Proceeding Against Plaintiffs**

20      74.    DSS exercised its discretion under Cal. Gov. Code §11517 to have an

21  Administrative Law Judge ("ALJ") hear the case. The ALJ hearing was held over

22  several days in May, 2018.

23      75.    Plaintiffs were precluded by law from making, at the ALJ hearing, a

24  constitutional argument that the "conduct inimical" statutes are void for vagueness under

25  the 14th Amendment. *See* California Constitution, Article III, Section 3.5 (prohibiting

26  administrative bodies from declaring statutes unconstitutional or refusing enforcement

27  of statutes on the basis of claims that such statutes are unconstitutional).

28      76.    On August 5, 2019, the ALJ issued its Proposed Decision ("Proposed

16

Complaint                                                                    Case No.

Decision"), affirming the denial of Satya Health and Dual Diagnosis's license applications; revoking Adeona's license to operate the RSD Facility; revoking Dual Diagnosis's (d/b/a Sovereign Health of California) jointly-held license to operate the Cordoba Facility; and prohibiting Sharma "*for the remainder of his life*, from employment in, presence in, and from contact with clients of, any facility licensed by the Department…and from holding the position of member of the board of directors, executive director, or officer of the licensee of any facility licensed by the Department." (Emphasis added).

77. Each of these penalties cited the "conduct inimical" ground listed in sections 1550(c) and1558(a)(2).

78. In its "Legal Conclusions" section, the DSS Decision acknowledged that "[c]onduct which is 'inimical' to someone's health, morals, welfare or safety, as used in Health and Safety Code sections 1550 and 1558, has not been subject to judicial interpretation." The DSS Decision noted "[t]he Merriam-Webster Dictionary defines 'inimical' as 'being adverse often by reason of hostility or malevolence' and 'having the disposition of an enemy.'"

79. The DSS Decision noted that "[DSS] contends that 'conduct inimical broadly references conduct that is inimical (hostile) to health, morals, welfare, or safety, as well as conduct that is not only inimical to an individual receiving services from the facility but also to the people of the State of California."

80. The DSS Decision concludes "[i]t was established that Sharma engaged in 'conduct inimical' by reason of his conduct that was the basis for the [UK] Decision…even though it occurred outside of California and did not involve any Department-licensed facility or persons residing in such facility." No further explanation is given.

81. The DSS Decision noted Plaintiffs' arguments for the record, including that the conduct underlying the UK Decision: did not violate any civil or criminal law, or any Department rule or regulation; did not involve any DSS-licensed facility or person(s)



Complaint                                                                                            Case No.

receiving treatment at such facility; and occurred outside of California many years in the past. Notwithstanding, the DSS Decision concluded "[Plaintiffs'] contention is not persuasive. **There is nothing in the statutory language of Health and Safety Code sections 1550 and 1558 which limits 'conduct inimical' as [Plaintiffs] contend**." (Emphasis added).

82.     And therein lies the problem: the "conduct inimical" statutes are wholly untethered to *any* definitions or explanations, and this utter lack of any reasonable limitations gives unfettered discretion to the DSS to make arbitrary decisions that eviscerate the property and liberty rights of those within its scope.

83.     On September 12, 2019, DSS agent Gregory E. Rose, Deputy Director of the Children and Family Services Division, adopted the ALJ's Proposed Decision with technical or other minor changes, per Gov. Code §11517(c)(2)(C). Per the terms of the adopted Decision, it became effective on September 27, 2019 (the "DSS Decision").[4]

84.     On September 26, 2019, Plaintiffs filed a petition for writ of administrative mandate with the Sacramento Superior Court to challenge the DSS Decision on the ground that it lacks an adequate basis for taking action against Plaintiffs. *Tonmoy Sharma v. DSS of the State of California,* 34-2019-80003230-CU-WM-GDS (the "Writ"). At the time of this filing, the Hearing on Writ of Mandate has not yet been held, and is scheduled for December 17, 2021. Regardless of the existence of the Writ proceeding, Plaintiffs are entitled to pursue damages in the forum of their choice – here, this federal district court action. *Gilbertson v. Albright,* 381 F.3d 965 (9th Cir. 2004).

**Plaintiffs Suffer Substantial and Ongoing Damage**

85.     As a direct result of the DSS Decision, and beginning on September 27, 2019, Plaintiffs were prohibited from continued operation of the RSD Facility and the Cordoba Facility. This caused the Entity Plaintiffs to lose thousands of dollars per day in

---

[4] This lawsuit was timely filed within two years of the effective date of the Decision. *See, e.g., Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.,* 509 F.3d 1020, 1026–27 (9th Cir. 2007); Cal. Civ. Proc. Code § 335.1.



Complaint                                                                                          Case No.

rental costs for buildings that they would otherwise be utilizing, expenses for staff that they would otherwise be employing, expenses for medical and clinical equipment that they would otherwise be using, other overhead expenses, and lost revenue. This harm is ongoing and will be proven at trial, but is estimated at this time to exceed $10,000,000.

86.     Also as a direct result of the DSS Decision, Dr. Sharma has been prohibited, since September 27, 2019, from holding any type of employment, management position, governing position, or board position with his previously-licensed facilities, or with any facility licensed by DSS. He has also been prohibited from applying for any substance abuse licenses, which he previously had. As such, he has been effectively deprived of the right to pursue his life's work. As a further result of Defendants' arbitrary actions, Dr. Sharma's professional reputation has been irreparably damaged.

87.     As a result of the DSS Decision, and in addition to the harm inherently stemming from a violation of his constitutional rights, Dr. Sharma has suffered harm in the form of lost wages, lost benefits, and lost business opportunities, as well as irreparable harm to his reputation. This harm is ongoing and will be proven at trial, but is estimated at this time to exceed $2,000,000.

## FIRST CLAIM FOR RELIEF

### Violation of the Fourteenth Amendment Right to Due Process

### 42 U.S.C. § 1983;

### (By Plaintiffs against DSS and Rose in his official capacity)

88.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

89.     The Fourteenth Amendment to the U.S. Constitution protects individuals against the deprivation of liberty or property by the government without due process. 42 U.S.C. §1983 provides that any person who acts under color of state law to deprive a citizen of rights, privileges, or immunities secured by the U.S. Constitution, shall be liable in an action at law, at equity, or for other redress.



Complaint                                                                                    Case No.

90.     DSS is a governmental entity, and Gregory Rose acted under color of state law when he acted in his capacity as Deputy Director of the Children and Family Services Division of DSS to issue the DSS Decision.

91.     The Entity Plaintiffs each had a property interest in their existing licenses.

92.     Sharma had a liberty and/or property interest in his generalized right to choose his field of private employment and his right to pursue an occupation as executive management of DSS-licensed facilities.

93.     Defendants, through adoption of the DSS Decision, deprived the Entity Plaintiffs of their existing licenses.

94.     Defendants, through adoption of the DSS Decision, deprived Sharma of his ability to pursue his profession and occupation.

95.     The DSS Decision was clearly arbitrary and unreasonable because it was based on unconstitutionally vague "conduct inimical" statutes set forth at Health and Safety Code sections 1550(c) and 1558(a)(2).

96.     The "conduct inimical" statutes are unconstitutionally void for vagueness, both facially and as-applied to Plaintiffs.

97.     Under the void-for-vagueness doctrine, due process requires enactments to be written with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *See, e.g., Kolender v. Lawson,* 461 U.S. 352 (1983).

98.     The "conduct inimical" statutes are impermissibly vague in all of their applications, because the statutes lack any clear definitions or standards regarding what conduct is, and is not, allowed. Nowhere in these statutes is "inimical" defined, nor is it explained what conduct might be "inimical…to the people of this state" as opposed to "inimical…to an individual in, or receiving services from, the facility."

99.     As the DSS Decision noted, the dictionary definition of "inimical" is being "adverse," which is a term with an equally vague and subjective definition. *See, e.g., Lowden v. County of Clare,* 709 F.Supp.2d 540 (EDMI 2010) (Michigan statute

Complaint                                                                                                          Case No.

prohibiting conduct that could "adversely affect" a funeral was unconstitutional both because it does not provide ordinary people with fair warning of what conduct is prohibited and also does not provide adequate direction to law enforcement). As such, the "Condcut Inimical" statutes are facially void for vagueness.

100.    Defendants' application of the "conduct inimical" statutes failed to give a person of ordinary intelligence fair notice that Plaintiffs' conduct was forbidden. *Palmer v. City of Euclid,* 402 U.S. 544, 545, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971) (per curiam). Indeed, far from putting Plaintiffs on notice that the UK Decision was "inimical," Defendants overtly led Plaintiffs to believe that there was nothing "inimical" in the existence of the UK Decision, by granting licenses to the Entity Plaintiffs and approving a "master application" for Dual Diagnosis and Satya Health following the DSS's consideration of the UK Decision. As such, the ground is void for vagueness as applied to Plaintiffs.

101.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief regarding the constitutionality of the "conduct inimical" statutes, as well as an injunction against DSS's enforcement of its DSS Decision against Plaintiffs on the ground of "conduct inimical."

102.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF**

**Violation of the Fourteenth Amendment Right to Due Process**

**42 U.S.C. § 1983**

**(By Plaintiffs against Rose in his individual capacity)**

103.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs as if fully set forth herein.

104.    Defendant Rose, acting under color of state law, violated Plaintiffs' Fourteenth Amendment rights to due process by adopting a DSS Decision that was

21



Complaint                                                                    Case No.

arbitrarily based on the "conduct inimical" statutes, which statutes are impermissibly vague, on their face and as applied to Plaintiffs, to deprive Plaintiffs of their property and/or liberty rights.

105.    Plaintiffs have a clearly established right not to be deprived of their property and/or liberty based on a vague and undefined term ("conduct inimical") that fails to provide Plaintiffs with adequate notice regarding what conduct is, and is not, prohibited.

106.    Indeed, Plaintiffs had no way of knowing that a decade-old foreign country administrative decision, which DSS knew about but had never previously indicated was problematic, and which had never before affected Plaintiffs' licensure with DSS, was suddenly considered "conduct inimical" and prohibited by DSS.

107.    A reasonable DSS officer would recognize that the "conduct inimical" statutes are patently violative of the fundamental constitutional principle of due process, and that it is clearly established that a licensee has a right to his/her/its property, absent conduct that is clearly proscribed.

108.    A reasonable DSS officer would recognize that the "conduct inimical" statutes are patently violative of the fundamental constitutional principle of due process, and that it is clearly established that an individual has a right to his profession and occupation, absent conduct that is clearly proscribed.

109.    When Defendant Rose, acting under color of state law, adopted the DSS Decision, he clearly violated Plaintiffs' due process rights in their property and/or liberty, and those rights were clearly established. *Person v. Callahan,* 55 U.S. 223 (2009).

110.    Defendant Rose acted in an objectively unreasonable manner when he deprived Plaintiffs of their property and/or liberty rights pursuant to the unconstitutionally vague "conduct inimical" statutes.

111.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to compensatory damages to make them whole from the financial and reputational



Complaint                                                                                      Case No.

damages they suffered as a direct and proximate result of Defendant's revocation of the Entity Plaintiffs' existing license and the termination of Sharma's ability to pursue his profession and occupation. Plaintiffs are also entitled to declaratory relief regarding the constitutionality of the "conduct inimical" statutes, as well as an injunction against DSS's enforcement of its DSS Decision against Plaintiffs on the ground of "conduct inimical."

112.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

//



Complaint                                                                                                    Case No.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court:

i.      Issue a declaratory judgment that Defendants' actions complained of herein violate the Fourteenth Amendment to the United States Constitution, and that California Health and Safety Code sections 1550(c) and 1558(a)(2) are constitutionally void for vagueness, both on their face and as applied to Plaintiffs;

ii.      Issue an injunction against Defendants' enforcement of its DSS Decision against Plaintiffs on the ground of "conduct inimical";

iii.      For compensatory damages in an amount to be proven at trial, but estimated to exceed $12,000,000.

iv.      For an award of attorneys' fees incurred in bringing this Action against Defendants, pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law;

v.      For costs of suit incurred herein; and

vi.      For such other and further relief as the Court deems just and proper.

Respectfully submitted,

Date: September 10, 2021          DHILLON LAW GROUP INC.

By: /s/  Krista L. Baughman
    KRISTA L. BAUGHMAN (SBN: 264600)
    kbaughman@dhillonlaw.com
    KARIN M. SWEIGART (SBN: 247462)
    ksweigart@dhillonlaw.com
    DHILLON LAW GROUP INC.
    177 Post Street, Suite 700
    San Francisco, California 94108
    Telephone: (415) 433-1700
    Attorneys for Plaintiffs Dual Diagnosis
    Treatment Center, Inc., Adeona Healthcare,
    Inc., and Tonmoy Sharma

24



Complaint                                                                 Case No.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury on all claims and issues in this action so triable.

Date: September 10, 2021                    DHILLON LAW GROUP INC.

                                        By: /s/ Krista L. Baughman
                                            KRISTA L. BAUGHMAN (SBN: 264600)
                                            kbaughman@dhillonlaw.com
                                            KARIN M. SWEIGART (SBN: 247462)
                                            ksweigart@dhillonlaw.com
                                            DHILLON LAW GROUP INC.
                                            177 Post Street, Suite 700
                                            San Francisco, California 94108
                                            Telephone: (415) 433-1700
                                            Attorneys for Plaintiffs Dual Diagnosis
                                            Treatment Center, Inc., Adeona Healthcare,
                                            Inc., and Tonmoy Sharma



Complaint                                                                                                          Case No.